**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | |
| DAVID CUTLER INDUSTRIES, LTD., | : | Chapter 11 |
| | : | |
| Debtor. | : | Bky. No.  09-18716 ELF |
| | : | |
| _____ | : | |
| DAVID CUTLER INDUSTRIES, LTD., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. No.  11-0792 ELF |
| | : | |
| BANK OF AMERICA, and, | : | |
| MARIX SERVICING, LLC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

# O P I N I O N

## I. INTRODUCTION

Plaintiff David Cutler Industries, Ltd. ("DCI"), the chapter 11 liquidating debtor herein,

seeks to avoid $155,313.84 in pre-petition transfers it made to Defendants Bank of America and

Marix Servicing, LLC.[1]  DCI made the transfers were made on account of a loan owed by its

then-president, Darryl Cutler and secured by a mortgage on his personal residence.  In its

Amended Complaint, DCI asserts that the transfers are avoidable pursuant to the actual and

constructive fraud provisions of the Bankruptcy Code, 11 U.S.C. §§544(b), 548(a), and 550, and

---

[1]     The parties stipulated that the transfers were made from DCI to Bank of America or its
servicing company, Marix Serving, LLC.  For ease of reference in this Opinion, I will refer to both
defendants as "BOA."

the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"), 12 Pa.C.S. §§5104 and 5105.

Based on the evidence presented during the two (2) day trial of this adversary proceeding, I conclude that DCI has proven that all of the transfers to BOA at issue were constructively fraudulent under PUFTA §5104(b)(2)(i) and §5105. Accordingly, judgment will be entered in favor of DCI and against BOA and Marix Servicing, LLC in the amount of $155,313.84.[2]

## II. JURISDICTION

This court unquestionably has subject matter jurisdiction pursuant to 28 U.S.C. §1334(b), 28 U.S.C. §157(a) and the Standing Orders of the District Court dated July 25, 1984 and November 8, 1990. However, since the United States Supreme Court's decision in Stern v. Marshall, 131 S. Ct. 2594 (2011), courts in this Circuit are divided on the question whether a bankruptcy court may enter a final order in an adversary proceeding brought pursuant to 11 U.S.C. §§544 and 548. Compare In re Int'l Auction & Appraisal Services, LLC, 493 B.R. 460, 463-65 (Bankr. M.D. Pa. 2013), with In re DBSI, Inc., 467 B.R. 767, 772-73 (Bankr. D. Del. 2012). If the bankruptcy court lacks the authority to enter a final judgment, it is also unclear whether the parties may consent to the entry of a final judgment by the bankruptcy court or waive the right to an Article III tribunal. Compare In re Bellingham Ins. Agency, Inc., 702 F.3d 553 (9th Cir. 2012), cert. granted sub nom., Exec. Benefits Ins. Agency v. Arkison, 133 S. Ct. 2880 (2013), with Wellness Int'l Network, Ltd. v. Sharif, 727 F.3d 751, 771-73 (7th Cir. 2013);

---

[2]     Because DCI obtains all of the relief it is seeking by virtue of its success on the two (2) claims identified in the text above, it is unnecessary to decide the merits of DCI's claims under PUFTA §5104(a)(1) and 11 U.S.C. §548(a) and I will not further analyze those claims in this Opinion.

Waldman v. Stone, 698 F.3d 910, 917-18 (6th Cir. 2012).

DCI and BOA have agreed that the fraudulent transfer claims in the Amended Complaint are core proceedings pursuant to 28 U.S.C. §157(b)(2)(H).  (See Pretrial Statements, Doc's. #47, 48).  BOA's agreement on that point may constitute consent to the entry of a final order.  See In re Wash. Coast I, LLC, 485 B.R. 393, 408-09 (B.A.P. 9th Cir. 2012).  However, in the event that it is determined that the bankruptcy court lacks the authority to enter a final judgment in this proceeding, this Opinion should be treated as proposed findings of fact and conclusions of law. See In re Scheffler, 471 B.R. 464 (Bankr. E.D. Pa. 2012); see also In re Universal Mktg., Inc., 459 B.R. 573, 576-77 (Bankr. E.D. Pa. 2011) (even if bankruptcy court lacks constitutional authority to enter final judgment in matter designated by Congress as "core," court nonetheless has subject matter jurisdiction and may enter proposed findings of fact and conclusions of law). Contra Wellness Int'l Network, 727 F.3d at 776-77 (if bankruptcy court lacks constitutional authority to enter final judgment in matter designated by Congress as "core," there is no statutory authority for bankruptcy court to enter proposed findings of fact and conclusions of law).


## III.  PROCEDURAL HISTORY

DCI filed its voluntary chapter 11 bankruptcy petition on November 16, 2009.  By order dated May 2, 2012, the court confirmed the Joint Chapter 11 Liquidating Plan filed by DCI and the Official Committee of Unsecured Creditors ("the Confirmed Plan").  Pursuant to §6.3 of the Confirmed Plan, the post-confirmation Debtor, acting through a Plan Administrator, is serving as the disbursing agent.  Section 7.4 of the Confirmed Plan provides expressly for the preservation of the Debtor's avoidance actions under chapter 5 of the Bankruptcy Code.

On October 11, 2011, prior to confirmation, DCI commenced this adversary proceeding by filing a complaint pursuant to 11 U.S.C. §§544(b), 548(a)(1)(A), 548(a)(1)(B), 550, and 551, and 12 Pa.C.S. §§5104(a)(1), 5104(a)(2), and 5105.  DCI later amended its complaint ("the Amended Complaint").  (Doc. #3).  On December 6, 2011, BOA answered the Amended Complaint, (Doc. #5), and asserted a Third Party Complaint against Darryl Cutler and Amy Cutler alleging that the Cutlers were jointly liable to DCI for indemnification and contribution on the mortgage, (Doc. #6).  Subsequently, the Third Party Complaint was dismissed for lack of subject matter jurisdiction.  (See Doc. #15).  BOA filed an amended answer on February 21, 2012.  (Doc. #18).

On June 21, 2012, BOA filed a motion for summary judgment.  (Doc. #22).  After briefing, the court denied the motion on the ground that material facts were in dispute.  (See Doc. #41).

Trial of this matter was held on December 7 and 10, 2012.  The parties submitted stipulated facts ("the Stipulated Facts") (Doc. #57), and supplemented the Stipulated Facts with testimonial and documentary evidence.[3]   This evidence included the testimony of and several expert reports prepared by Ira M. Feldman ("Feldman").  Post-trial briefing was completed on March 21, 2013.

---

[3]     The transcript from the first day of trial will be cited as "1 N.T." and from the second day of trial as "2 N.T."

## IV.  FINDINGS OF FACT

I make the following findings of fact based upon the Stipulated Facts and the documentary and testimonial evidence presented at trial.

### DCI's Stock

DCI is a Pennsylvania corporation that purchased and resold waste paper and paper rolls. At the outset, David Cutler ("David") was the President and sole shareholder of DCI.  His son, Darryl Cutler ("Darryl"), began working for DCI in the mid-1980's as a salesman.  Later, Darryl assumed the role of President in 1992 or 1993, while David remained the sole director of DCI. (Stipulated Facts ¶9).  Michael Flitter ("Flitter") served as DCI's corporate accountant/comptroller from 1990 until 2009.  (2 N.T. 61).

Darryl became a shareholder when DCI reorganized its capital structure in 1987.  (1 N.T. 168-69).  In that restructuring, David redeemed some or all of the nonvoting stock of DCI in exchange for a $3.7 million promissory note ("the Note").  (More on the promissory note in a moment).  Through some mechanism that was not fully explained, some or all of the nonvoting stock was gifted to a trust for Darryl's benefit ("the Darryl Trust").  (Stipulated Facts ¶9; 1 N.T. 169).[4]  David retained the voting stock of DCI until his death in September 2004, at which time it passed to his decedent's estate ("the David Estate").  Jonathan Gayl ("Gayl") and Hannah Cutler ("Hanna") were named the David Estate's executors.  (Id.).

---

[4]      The mechanics are not clear.  In his testimony, Gayl referred to David conducting a "recapitalization" in which he redeemed 99.9% of his stock "so that he could then make a gift of a portion of the remaining stock to Darryl's trust without it being a taxable."  (1 N.T. at 169).

In his will, David bequeathed the voting stock to the Darryl Trust, provided that the Trust pay the David Estate fair market value for the stock. (Stipulated Facts ¶9). Despite negotiations, the Darryl Trust (i.e., Darryl) and the David Estate (i.e., Gayl and Hannah) could not reach an agreement on the voting stock's fair market value. As a result, after David's death, transfer of the stock to the Daryl Trust did not occur, (id.), and it appears that the David Estate remained in control of the stock. Meanwhile, Darryl continued to run DCI in his capacity as its President.

In May 2009, the David Estate called a shareholders meeting and elected Gayl and Hannah as DCI's directors. (See Ex. 508). In June 2009, the Board of Directors of DCI, limited Darryl's total compensation to $250,000.00 per year and revoked his authority to control DCI's financial accounts, including check writing. (See Ex. 509).

On August 11, 2009, the Board elected Gayl as President and Treasurer, and Hannah as Vice-President and Secretary. (See Ex. 512). On August 12, 2009, Darryl resigned from DCI. (See Ex. 513). The chapter 11 bankruptcy case was filed slightly more than three (3) months later.

## The Promissory Note

In connection with the redemption of David's stock as part of the February 1987 "recapitalization," see n.4, supra, DCI issued a $3.7 million promissory note payable to David with a March 1, 1993 maturity date ("the Note"). (See Ex. 305.23; 1 N.T. 168-69). The Note obligated DCI to tender interest-only payments for the first year and then commence principal and interest payments on June 1, 1988. The Note also provided that it is governed by Pennsylvania law. (See id.).

David, signing in his capacity as President and Secretary, executed the Note on DCI's

behalf. The Note is stamped with DCI's corporate seal directly above the notation: "[Corporate

Seal]" and directly to the left of David's signatures. (See id.).

In October 1991, the Note was modified, inter alia, to extend the maturity date until

September 30, 1994. (See Ex. 305.24). David signed the modification as President. The Note

modification was not imprinted with DCI's corporate seal.

DCI paid regular interest payments pursuant to the Note from 1987 through September

2004. (1 N.T. 183). Prior to 2004, only one (1) principal payment was made on the Note. DCI

continued to carry the Note on its corporate books through the chapter 11 bankruptcy filing in

November 2009. (Id. at 78). The Note was the subject of a subordination agreement among

Bryn Mawr Trust Company ("BMT"), David, and DCI. (Id. at 179). DCI reaffirmed the

subordination agreement in a modification to its loan agreement with BMT in April 2008. (See

Ex. 305.20B, ¶9(f)).


### The BOA Mortgage

In 2002, Darryl and his wife, Amy Cutler (collectively "the Cutlers") became obligated to

BOA, on a home loan secured by a first mortgage ("the Mortgage") on their residence in Bryn

Mawr, Pennsylvania (the "Residence"). (Stipulated Facts ¶3). DCI was not obligated on the

Mortgage to the Cutlers; nor did it guarantee the Mortgage. (Id. at ¶3).

Beginning in June 2007, DCI began making payments on the Mortgage from its corporate

operating accounts directly to BOA. (Id. at ¶4). BOA and its servicing company accepted the

payments from DCI on behalf of Darryl and credited the monthly payments against the Cutlers'

loan obligation on the Residence.  (Id. at ¶5).  From June 2007 to August 2009, DCI made

payments aggregating $155,313.84 to BOA ("the Transfers") on behalf of the Cutlers for the

repayment of the Mortgage.  (Id. at ¶6).  Throughout this time frame, Darryl was DCI's President.

(Id. at ¶8).

In its corporate books, DCI reported the Transfers as a business expense against revenue.

(2 N.T. 65).  DCI did not withhold employment taxes on the Transfers (Stipulated Facts ¶11), or

report the Transfers on Darryl's W-2 Statement or a Form 1099.  (2 N.T. 99).


### Darryl's Compensation

In January 1987, DCI entered into an employment agreement ("the Employment

Agreement") with Darryl.  (See Ex. 501 at 3).  The Employment Agreement provided that Darryl

would receive a base salary for the first nine (9) months, and an annual bonus computed based on

a percentage of any increase in DCI's net operating profits from its roll business.  (Id.).

However, the base salary was not specified in the Employment Agreement.  After the initial nine

(9) months, Darryl's base salary would be adjusted based on a percentage connected to either CPI

or DCI's operating profit.  (See id.).  The Employment Agreement did not mention any DCI

obligation to make payments to third-parties for Darryl's personal obligations.[5]

For tax years 2005 though 2009, Darryl reported approximately $125,000.00 per year as

wage income on his federal income tax returns.  (See Ex.'s. D-12 – D-16).  During this time,

---

[5]        The evidentiary record is unclear whether the base salary or bonus formulas in the
Employment Agreement were strictly followed.  (See 1 N.T. 128-29).  It is equally unclear whether the
Employment Agreement was still in effect at the time of the Transfers in 2007 though 2009.

Darryl was the CEO and determined what DCI would pay him.  (2 N.T. 142).

In the same period, aside from his salary, Darryl drew between $430,000.00 and $765,000.00 per year from the company.  (See Ex. 303).  Flitter reviewed DCI's monthly bank statements and tracked draws made to or on Darryl's behalf.  (2 N.T. 67).   He then determined how these draws were categorized in DCI's corporate books and records.  Flitter generally recorded large advances or expenses to the "Loans and Exchange Account" ("the L&E Account").  (Id. at 131).  These loans or advances were not treated as income to Darryl and were not recorded as an expense of DCI.  (Id. at 105).  Darryl was not charged interest and DCI did not report imputed interest on the L&E Account.  (Id. at 97).  The Transfers were categorized as "commissions" to Darryl.  (Id. at 64-65).  Also, Darryl reported the Transfers as income on his personal federal income tax returns.  (Stipulated Facts ¶12).


## Financial Condition of DCI

Flitter admitted that DCI's stated financial information on its balance sheet was incorrect for an extended period of time.  (2 N.T. 88-89).  Accounts payable were understated by more than $1 million and had been since 1990.  (Id. at 179).  Flitter made no attempt to correct the corporate records.  (Id. at 128).

At some point, Flitter also began compiling dual financial statements for DCI.  (Id. at 81-82).  One set was used internally by DCI and one set was given to BMT.  (Id. at 85-88).

Debra Farina ("Farina") started her employment with DCI in 1992 as a part-time clerk and became a full-time office manager in 2002.  Farina handled DCI's accounts payables and receivables.  (Id. at 19-21).  Darryl instructed Farina which creditors and bills, if any, would be

paid.  (Id. at 21, 26).  DCI's bills were frequently paid late or not until the creditor exerted

pressure on DCI's staff to be paid.  (Id. at 21).[6]  DCI received shutoff notices from utility and

telephone companies and late notices on its lease of office equipment.  (Id. at 23, 39-40).[7]  As a

result, DCI had procedures in place to allow Farina to use a company credit card for emergencies.

Towards the end of Darryl's tenure as President, Farina testified that nothing was being paid.

Darryl admitted that DCI paid its bills late, conceding that "[t]hey were late, but we never lost an

account due to non-payment."  (Id. at 148).

Between 2005 to 2009, Darryl made loans to DCI totaling $5.7 million.[8]  (Id. at 148-49).

From 2005 through 2009, after adjustments, DCI showed negative equity of

approximately $2.1 million to $8.7 million each year.  (See Ex. 301; 1 N.T. 26-27).  Based on

average industry data, DCI should have been operating with an equity level of approximately $4

million.  (See Ex. 302; 1 N.T. 29-30).

---

[6]     Farina testified: "I would tell [Darryl] . . . that these people called. . . . It was almost like
it was a joke, like if someone calls three or four times and pestered more, they might get paid."  (2 N.T.
30).

[7]     Similarly, another former employee, Howard Chinn, testified that he encountered
difficulty in the performance of his sales duties because DCI did not pay vendors.  According to Chinn,
because DCI did not have paper product, he was inhibited from turning over and reselling the product.
Chinn also stated that the cellular telephones that DCI's sales team used for business were disconnected
several times because DCI failed to pay its service provider.

[8]     Darryl explained that whenever DCI needed cash, he would write a check from his
personal account and deposit it into DCI's operating account.  (2 N.T. 150-151).  According to Darryl,
after comparing the payments he received from DCI (including salary) to the loans he paid to DCI, he
received a net gain of $152,000.00.  (Id. at 149-50).  Darryl qualified his calculations by stating that he
did not consider the L&E Account in his computation.

In 2005, compared to industry averages of 7.7% of cash assets per total assets, (computed by the RMA),[9] DCI had approximately 2% of its assets in cash.  (See Ex. 302; 1 N.T. 31).  In 2008, DCI had approximately 0.4% of its assets in cash; industry average was 5.6%.  (See Ex. 302; 1 N.T. 32).   In 2008, its inventory was 5.8% of total assets; the RMA average was 22.7%. (See id.).  Comparable companies in DCI's industry would average 36% of its assets based on equity, but DCI had zero equity from 2005 though 2009.  (1 N.T. 31).

# V.  DISCUSSION

## A.  Statutory Framework

DCI argues that the Transfers to BOA constitute fraudulent transfers under 11 U.S.C. §544(b)(1) of the Bankruptcy Code.  Section 544(b)(1) provides that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502. . . ."  Section 544(b) allows DCI to step into the shoes of an actual creditor who existed at the commencement of the bankruptcy case, and avoid the fraudulent transfers pursuant to state law.  See also 11 U.S.C. §1107 (chapter 11 debtor in possession may exercise the powers of a trustee).

DCI invokes both §§5104(a)(2) and 5105 of PUFTA, 12 Pa. C.S. §5104, 5105.

Section 5104(a) provides:

---

[9]      "RMA" refers to the Risk Management Associates Annual Statement Studies.  The Debtor's expert testified that the RMA is a nationally recognized publication that breaks down financial information by industry, based upon asset value as well as sale value.  (1 N.T. at 28).

General rule.  –  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

* * *

(2)  **without receiving a reasonably equivalent value** in exchange for the transfer or obligation, **and** the debtor:

(i)  was engaged or was about to engage in a business or a transaction for which the **remaining assets of the debtor were unreasonably small in relation to the business or transaction**; or

(ii)  intended to incur, or believed or reasonably should have believed that the debtor **would incur, debts beyond the debtor's ability to pay as they became due**.

(emphasis added).

Section 5105 provides:

A transfer made or obligation incurred by a debtor is fraudulent **as to a creditor whose claim arose before the transfer was made** or the obligation was incurred if the debtor made the transfer or incurred the obligation **without receiving a reasonably equivalent value** in exchange for the transfer or obligation and the debtor was **insolvent at that time or the debtor became insolvent** as a result of the transfer or obligation.

(emphasis added).[10]

---

[10]      DCI also asserts that the Transfers are constructively fraudulent pursuant to §548(a)(1)(B) of the Bankruptcy Code, which provides that the trustee may avoid a transfer made within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(i)  received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)

(I)  was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II)  was engaged in business or a transaction, or was about to engage in

(continued...)

There is no dispute that the Transfers were of an interest in DCI's property. The parties also agree that the Transfers occurred within four (4) years prior to DCI's November 19, 2009 bankruptcy petition and that DCI had unsecured creditors at the time of the petition who would have been able avoid the Transfers (if they are avoidable under PUFTA). Therefore, if DCI can satisfy the remaining requirements of the constructive fraud provisions, all the Transfers will be avoidable.

## B. The Parties' Contentions

BOA asserts an affirmative defense based on the doctrine of <u>in pari delicto</u>. As will be amplified below, BOA contends that the David Estate, as DCI's controlling shareholder, bears the ultimate culpability for any loss DCI suffered as a result of the Transfers and is therefore,

---

[10](...continued)

        business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

  (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

  (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

     The constructive fraud provisions of PUFTA and the Bankruptcy Code are very similar. One difference is that PUFTA distinguishes between transfers that may be avoided only by creditors existing at the time of the transfer (PUFTA §5105) and transfers that may be avoided by existing and future creditors (PUFTA §5104(a)(2)). That difference is immaterial here because there was ample evidence that DCI had actual creditors at the time of the Transfers. Therefore, pursuant to §544(b), DCI may assert a claim under PUFTA §5105 as well as §5104(a)(2).

     The other difference between the statutes does matter. While PUFTA has a four (4) year "reachback," §548 of the Bankruptcy Code only has a two (2) year "reachback." DCI seeks to set aside transfers going back two (2) years and five (5) months. Because PUFTA captures all the Transfers involved in the Amended Complaint, I will analyze the Transfers under the state law provisions.

barred from recovery in this proceeding.

Alternatively, BOA argues that DCI received reasonably equivalent value in the services provided by its then-President, Darryl.  In effect, BOA expands the Transfer transactions, viewing them as though each Transfers had been paid first to Darryl as part of a reasonable compensation package, after which he forwarded the payments to BOA in satisfaction of his BOA Mortgage obligation.  BOA also argues DCI failed to establish an essential element of its claim under PUFTA §5105, i.e., that DCI was insolvent when the Transfers were made or was rendered insolvent by the Transfers.

DCI denies that the in pari delicto doctrine is applicable.  DCI also argues that it has: (1) proven the two critical elements under PUFTA §5105 (lack of reasonably equivalent value for the Transfers and insolvency), and (2) proven its claim under §5104(a)(2)(i) (requiring proof that DCI did not receive reasonably equivalent value and that DCI was unreasonably undercapitalized at the time of the Transfers).

## C.  In Pari Delicto

In its post-trial submission, BOA devotes considerable effort arguing that it is entitled to judgment in its favor based upon the doctrine of in pari delicto.  As explained below, I conclude that this defense is not available to BOA.

### 1.

The in pari delicto doctrine is an equitable doctrine that can serve as an affirmative defense against claims that are brought against a defendant.  The doctrine instructs that "a party is barred from recovering damages if his losses are substantially caused by activities the law

forbade him to engage in." American Trade Partners, L.P. v. A-1 Int'l Importing Enters., Ltd.,

770 F. Supp. 273, 276 (E.D. Pa. 1991). Restated slightly, "a plaintiff may not assert a claim

against a defendant if the plaintiff bears fault for the claim." Official Comm. of Unsecured

Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 354 (3d Cir. Pa. 2001) (citing Feld and Sons, Inc.

v. Pechner, Dorfman, Wolfee, Rounick & Cabot, 458 A.2d 545, 548-49 (Pa. Super. Ct. 1983)).

The doctrine serves at least two purposes: (1) relieving the courts of the task of mediating

disputes among wrongdoers and (2) deterring illegal conduct. Official Comm. of Unsecured

Creditors of Allegheny Health Educ. and Research Found. v. PriceWaterhouseCoopers LLP, 989

A.2d 313, 329 (Pa. 2010) ("Allegheny Health").[11]

In Allegheny Health, the Pennsylvania Supreme Court provided substantial guidance

regarding the scope of in pari delicto in Pennsylvania, in a lengthy, complex opinion, issued after

accepting the certification of two (2) questions posed by the Third Circuit Court of Appeals.[12]

Among the principles stated in Allegheny Health are:

- The doctrine is related to the "clean hands" maxim applicable in equity cases,
  but "has surmounted its moorings in strict equity jurisprudence and
  transitioned into a defense in actions at law." 989 A.2d at 328.

- Its application is "integrally dependant on the setting" in which it is invoked
  and the inquiry into its applicability "takes on another dimension when
  addressing statutory causes of action, since the specific legislative objectives
  of the enactment controlling the parties' legal rights must be considered." Id.

---

[11]      In this Opinion, I will use the short cite "Allegheny Health" to refer only to the
Pennsylvania Supreme Court opinion.

[12]      See Official Comm. of Unsecured Creditors of Allegheny Health Educ. and Research
Found. v. PriceWaterhouseCoopers LLP, 2008 WL 3895559 (3d Cir. July 1, 2008).

at 328 n.16, 329 n.18.[13]

- The defense "requires the plaintiff be an active, voluntary participant in the wrongful conduct or transaction(s) for which it seeks redress, and bear 'substantially equal [or greater] responsibility for the underlying illegality' as compared to the defendant." Id. at 329 (quoting McAdam v. Dean Witter Reynolds, Inc., 896 F.2d 750, 757 (3d Cir. 1990)).[14]

The frequent starting point in evaluating the in pari delicto doctrine in cases involving corporate entities is the concept of "imputation," i.e., determining whether the wrongful conduct of a corporate officer should be imputed to the corporation. See id. at 330 n.20 ("where corporate plaintiffs are involved, the subject of imputation is a key focus"). Imputation is a question of state law. See Official Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v. PriceWaterhouseCoopers, LLP, 2007 WL 141059, at *8 (W.D. Pa. Jan. 17, 2007).[15]

In Allegheny Health, the Court began its analysis of imputation with the principle that "principals generally are responsible for the acts of agents committed within the scope of their authority." 989 A.2d at 333. Imputation "is founded on the duty of the agent to communicate all material information to his principal, and the assumption that he has done so." Id. at 333 n.28

---

[13]     In this vein, the court also stated that the doctrine "permits matters of public policy to be taken into consideration in determining the defense's availability in any given set of circumstances" and rejected the contention that the defense should be "woodenly applied and vindicated in any and all instances in which the culpability of the plaintiff can be said to be at least equal to that of the defendant." Allegheny Health, 989 A.2d at 330 (citations omitted).

[14]     Several state courts have dispensed with the requirement that the plaintiff's degree of fault must be equal to or greater than that of the defendant. Pennsylvania has not relaxed this requirement. Allegheny Health, 989 A.2d at 329 n.19.

[15]     Here DCI was a Pennsylvania corporation; presumably Pennsylvania law will apply.

(citing Byrne v. Dennis, 154 A. 123, 125 (Pa. 1931)).  This policy creates incentives to the principal to select its agents carefully; it also serves to protect those who transact business with a corporation through its agents.  Allegheny Health, 989 A.2d at 333.

A frequent issue that arises in evaluating imputation is the applicability (or non-applicability) of the "adverse interest" exception to the general rule of imputation.  The adverse interest exception provides that a corporate agent's conduct will not be imputed to the corporation if the officer acted in his own interest and to the corporation's detriment.  Id.; see Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 359 (3d Cir. 2001); see also Restatement (Third) of Agency §5.03.

To further complicate the analysis, there is an exception to the "the sole actor" exception, "where the principal and agent are one and the same."  In re Mediators, Inc., 105 F.3d 822, 827 (2d Cir. 1997).  If the agent who committed the wrongful act was the sole shareholder of the corporation or dominated the corporation, the conduct is imputed to the corporation.  See, e.g., id.  The rationale for this rule is that if the sole agent has no one to whom he can impart his knowledge, or from whom he can conceal it, the corporation must bear the responsibility for allowing an agent to act without accountability.  Lafferty, 267 F.3d at 359.


**2.**

In this proceeding, BOA contends, in essence, that any loss DCI may have suffered was caused by its controlling shareholder (the David Estate, acting through the executors)  –  the same party that is the largest creditor in this case and that stands to gain the most from a recovery in this adversary proceeding.

More specifically, BOA contends that, to the extent that the Transfers were fraudulent

transfers, they resulted from the David Estate's breach of its own fiduciary duties to creditors of

the insolvent company.[16]  According to BOA, even if Darryl caused the Transfers to be made for

his own benefit and to the detriment of DCI, the David Estate bears ultimate responsibility for the

Transfers because the David Estate was the controlling shareholder, it was aware that Darryl was

taking excessive draws from DCI, and it took no action for several years to protect DCI and its

creditors from Darryl's conduct.

> DCI, whose management consists of the same persons who had the power and authority to stop or mitigate compensation concerns but failed to do so in order to protect their own self-interests (i.e., that of the [David]Estate) now get righteously indignant about what they themselves tolerated and allowed. But for the malfeasance of DCI's present management, there would be no problem, no alleged fraudulent conveyances. DCI made what could be recoverable transfers only because they allowed it. They committed the errors; they breached the legal duties owed to the creditors of DCI. They cannot now suggest that they were wrong, but not assert a claim against themselves for their own failings.  They cannot demand nor recover from innocent payees ransom for what they NOW assert are misdeeds – their misdeeds

(BOA Supp. Mem. at 4 (unpaginated)) (footnote omitted).

Recasting this argument in terms of common law torts, it appears that BOA is arguing

that even if Darryl wrongfully diverted DCI assets to pay his personal loan, the controlling

shareholders' misconduct was a supervening cause of DCI's loss and that it should not recover

---

[16]      BOA points out that DCI's position is that it was insolvent at all relevant times and that upon insolvency "the fiduciary duty of the controlling shareholders arises in favor of the corporate creditors." In re Jamuna Real Estate LLC, 365 B.R. 540, 570 (Bankr. E.D. Pa. 2007); see also In re Total Containment, Inc., 335 B.R. 589, 603-04 (Bankr. E.D. Pa. 2005).

due its own contributory negligence.[17]

## 3.

Without deciding whether the David Estate's failure, as controlling shareholder, to intervene in DCI's operations, would support BOA's in pari delicto defense in the factual circumstances presented here, I conclude, on other grounds, as a matter of law, that BOA may not invoke the defense.  I reach this result based on binding precedent: In re The Personal and Business Ins. Agency, 334 F.3d 239 (3d Cir. 2003).

Personal and Business Ins. Agency is best understood in relation to the Court of Appeals' earlier decision in Lafferty.  In Lafferty, the Creditors' Committee brought claims against various parties alleging they conspired with the debtor's management to issue debt securities, thereby deepening the debtor's insolvency and injuring the debtor.  The Lafferty Committee asserted state law claims of the debtor corporation that passed into the bankruptcy estate upon the filing of the bankruptcy case.  See 11 U.S.C. §541(a).  The Committee, acting on behalf of the bankruptcy estate in lieu of the bankruptcy trustee succeeded to these claims.  See Lafferty, 267 F.3d at 356.

---

[17]     Interestingly, in Allegheny Health, the Court recognized the similarity between the in pari delicto doctrine and concepts of contributory and comparative negligence defense:

> [I]n pari delicto has also been referenced by courts in the negligence setting, for example, in cases involving personal injury or property damage. In this class of cases at least, however, the comparative negligence and contribution statutes serve to cover much of the ground formerly traveled by reference to the common-law maxim. . . .  Thus, where these statutes are applicable, it is only in unusual cases involving intentional wrongdoing on the part of a plaintiff in which in pari delicto may retain relevance.

989 A.2d at 328 n.17.

Bankruptcy trustees are authorized to "commence and prosecute any action or proceeding on behalf of the estate before a tribunal." Fed. R. Bankr.P. 6009. "Such actions fall into two categories: (1) those brought by the trustee as successor to the debtor's interest included in the estate under Section 541, and (2) those brought under one or more of the trustee's avoiding powers." Lafferty, 267 F.3d at 356.

With respect to the first category of trustee actions, §541(a) provides, inter alia, that the bankruptcy estate is comprised of "all legal or equitable interests of the debtor as of the commencement of the case." 11 U.S.C. §541(a) (emphasis added). The Lafferty court concluded that §541(a)'s plain language "directs courts to evaluate defenses as they existed at the commencement of the bankruptcy." 267 F.3d at 356. Therefore, the Committee's status as an innocent successor did not bar the defendants from asserting defenses that could have been raised against the debtor (including the in pari delicto defense).

Lafferty instructs that in any action brought by a bankruptcy trustee rooted in 11 U.S.C. §541(a), the post-petition replacement of management or equity with a bankruptcy trustee does not preclude the defendants from raising the in pari delicto defense; rather, the trustee stands in the shoes of the debtor and is "subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor." Id. (citing Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149, 1154 (3d Cir.1989)).

There is, however, a difference between a claim asserted by a bankruptcy trustee as the successor to the debtor under 11 U.S.C. §541(a) and the second category of trustee actions:

-20-

claims asserted pursuant to the trustee's avoidance powers, 11 U.S.C. §§544, 547, 548, 549.[18]

That difference is critical in evaluating the availability of BOA's asserted in pari delicto defense.

In Personal and Business Ins. Agency, the Court of Appeals held that the holding in

Lafferty  –  that post-petition events (such as the replacement of management with an "innocent"

trustee) has no impact on the defenses available against claims asserted by the trustee  –  is

limited to causes of action derived from 11 U.S.C. §541(a) and does not apply to actions brought

under 11 U.S.C. §548.  See Personal and Business Ins. Agency, 334 F.3d at 245-46.  The court

reasoned that: (1) as a policy matter, the in pari delicto defense "loses its sting" when applied to a

successor plaintiff "representing the interests of innocent creditors" and (2) "[t]here is no limiting

language in §548 similar to that in § 541, and without that language there is no reason not to

follow the better rule."  Id. at 246.

The holding in Personal and Business Ins. Agency  has been extended to the trustee's

avoidance powers under §544(b).  See Kaliner v. MDC Sys. Corp., LLC, 2011 WL 203872 (E.D.

Pa. Jan. 20, 2011); In re Norvergence, Inc., 405 B.R. 709, 741-42 (Bankr. D.N.J. 2009); see

generally In re Student Fin. Corp., 335 B.R. 539, 554-555 (Bankr. D. Del. 2005) (because §510

lacks limiting language of §541(a), in pari delicto is no defense to equitable subordination claim).

_____

[18]    The majority view is that a trustee's statutory avoidance claim is not property of the
debtor to which a trustee succeeds under §541(a); an avoidance claim is not property of the bankruptcy
estate.  See generally In re Feiler, 218 F.3d 948, 953 (9th Cir. 2000) ("what property is part of the
bankruptcy estate and what property may be recovered with a trustee's avoidance powers are two separate
questions"); In re Gronczewski, 444 B.R. 526, 531 n.3 (Bankr. E.D. Pa. 2011) (citing line of cases
holding that property transferred by the debtor pre-petition becomes estate property only after it has been
recovered by the bankruptcy trustee); In re Wagner, 353 B.R. 106, 112-13 (Bankr. W.D. Pa. 2006)
(trustee's statutory avoidance claim is not property of the estate, but property actually recovered in
exercise of the avoidance power is property of the estate).

These decisions are correctly decided.  As the Bankruptcy Appellate Panel for the Sixth

Circuit has explained:

> [In exercising the Bankruptcy Code's avoidance powers, a] trustee not only stands
> in the shoes of a debtor, but is accorded this footwear unsoiled by the debtor's
> previous steps. In addition, a trustee can further choose the footwear of any
> creditor holding an allowable unsecured claim under applicable law. . . . .
> Additionally, courts have consistently recognized that the Trustee may pursue
> fraudulent or preferential transfers despite the fact that the debtor was a knowing
> and willing participant to such conveyances. The distinction recognized repeatedly
> by the courts is that although privity may bar a trustee's actions if the prior
> judgment involved a personal cause of action of the debtor, privity does not bar
> causes of action brought by the trustee as a representative of creditors.

In re Fordu, 209 B.R. 854, 863 (B.A.P. 6th Cir. 1997) (quotations and citations omitted); see also

In re Vaughan Co., Realtors, 2013 WL 960143, at *5-6 (Bankr. D.N.M. Mar. 11, 2013); In re

Pearlman 472 B.R. 115, 122-23 (Bankr. M.D. Fla. 2012); In re Fabian, 458 B.R. 235, 261-62

(Bankr. D. Md. 2011).[19]

In this adversary proceeding, DCI is not acting for the benefit of its equity owners in

bringing the §544(b) claim against BOA; rather, DCI is acting on behalf of the bankruptcy estate

pursuant to its statutory authority as liquidating trustee (successor to the debtor in possession).

See 11 U.S.C. §1107(a); see also MDC Sys., 2011 WL 203873, at *6 (trustee's fraudulent

transfer "claims are not personal to any specific creditor; rather, they are general claims that will

benefit the entire estate").[20]  Consequently, DCI's §544(b) claim falls squarely within the

---

[19]     All of these decisions holding that the in pari delicto doctrine is inapplicable to
bankruptcy trustee avoidance actions may be characterized as a practical application of Pennsylvania
Supreme Court's suggestion that the legislative objectives in creating statutory causes of action and
considerations of "public policy" may override the in pari delicto doctrine.  See Allegheny Health, 989
A.2d 330; see also Part V.C.1., supra.

[20]     This is another flaw in BOA's defense theory.  DCI is acting in a representative capacity.
(continued...)

principles set out in the cases cited above.   Based on these authorities, BOA's in pari delicto

defense fails as a matter of law.

## D.  Reasonably Equivalent Value

Next, I consider BOA's argument that DCI received reasonably equivalent value for the

Transfers made on account of Darryl's Mortgage.

### 1.

The Third Circuit Court of Appeals instructs that a two-step process is employed to

---

[20](...continued)
While its controlling shareholder (the David Estate) may or may not have been overly passive in
permitting Darryl to operate DCI unfettered  – an issue I do not reach  – the benefits of this action against
BOA will not accrue solely to the David Estate (in its capacity as holder of the Note).  There are other
creditors who could receive an enhanced distribution under the terms of the confirmed chapter 11
liquidating plan if DCI recovers the value of the Transfers.  A review of the Claims Register reveals that,
without consideration of filed priority claims or claims allowed because they were scheduled as
noncontingent, liquidated and undisputed, see Fed. R. Bankr. P. 3003(b)(1), more than 35 claims (other
than the David Estate's claim), in excess of $1.3 million, have been allowed.

         In this regard, I note further that §544(b) allows the bankruptcy trustee to access the state
law avoidance claims of any actual creditor of the debtor.  Thus, even if the David Estate's conduct could
give rise to an in pari delicto defense in a nonbankruptcy PUFTA action, the defense would not be
applicable to a PUFTA action brought by any of DCI's other creditors. DCI, as bankruptcy trustee, can
"stand in the shoes" of any of those other creditors.  See In re Greater Southeast Community Hosp. Corp.
I, 365 B.R. 293, 301-02 (Bankr. D.D.C. 2006); In re Porras, 312 B.R. 81, 97 (Bankr. W.D. Tex. 2004).

         Finally, I observe that it is questionable whether BOA falls within the class of defendants
that the doctrine was intended to protect.  In Allegheny Health, the court stated that the underlying
purpose of imputation "is fair risk-allocation, including the affordance of appropriate protection to those
who transact business with corporation."  989 A.2d at 335.  In this matter, it is doubtful that BOA was
"transacting business" with DCI within the Pennsylvania Supreme Court's meaning.  BOA was not in
any contractual relationship with DCI.  DCI was merely a third party who made payments on behalf of
another party (Darryl), who was in the contractual relationship with BOA.  Would it ever be appropriate
to extend the in pari delicto doctrine to this setting unless, perhaps, the "sole actor" doctrine applies?

determine whether a debtor received reasonably equivalent value in the form of indirect

economic benefits in a particular transaction: (1) whether any value is received, and (2) whether

that value was reasonably equivalent to the transfer made.  In re R.M.L., 92 F.3d 139, 152 (3d

Cir. 1996); see also Fid. Bond & Mortg., 340 B.R. 266, 287 (Bankr. E.D. Pa. 2006), aff'd, 371

B.R. 708 (E.D. Pa. 2007).  Because the purpose of PUFTA is to protect creditors, the court

determines whether value was received from the vantage of the creditor.  Fid. Bond & Mortg.,

340 B.R. at 286.  The inquiry is "what did the debtor give up and what did it receive that could

benefit creditors."  Id. (citing In re Joy Recovery Tech. Corp., 286 B.R. 54, 75 (Bankr. N.D. Ill.

2002)).

       In this determination, "value . . . include[s] any benefit . . . whether direct or indirect."  In

re Fruehauf Trailer Corp., 444 F.3d 203, 212 (3d Cir. 2006) (citation omitted); Mellon Bank,

N.A. v. Metro Communications, Inc., 945 F.2d 635, 646-47 (3d Cir. 1991).  The "touchstone" in

the determination is whether the parties exchanged comparable "realizable commercial value."

Mellon Bank, 945 F.2d 647.  Thus, if a debtor's "realizable going concern value after the

transaction is equal to or exceeds its going concern value before the transaction, reasonably

equivalent value has been received."  Id.

       Courts look to the totality of the circumstances, considering such factors as "fair market

value compared to the actual price paid, the arm's-length nature of the transaction, and the good

faith of the transferee."  Fid. Bond & Mortg., 340 B.R. at 287 (citing R.M.L., 92 F.3d at 145,

153).  If a court concludes that the benefits the debtor received "are minimal and certainly not

equivalent to the value of a substantial outlay of assets," a plaintiff need not prove the exact

value conferred because the "amount" of value is then rendered irrelevant.  Fruehauf Trailer

Corp., 444 F.3d at 214.

The party challenging the transfer bears the burden of proving all of the elements of a constructive fraudulent transfer claim under PUFTA §5104(a)(2) and 5105. Fid. Bond & Mortg. Co., 371 B.R. at 716-22; accord Titus v. Shearer, 2013 WL 5466805, at *4-5 (W.D. Pa. Sept. 30, 2013); In re C.F. Foods, L.P., 280 B.R. 103, 112-15 (Bankr. E.D. Pa. 2002); cf. In re Spitko, 2007 WL 172042, at *4, 15-16 (Bankr. E.D. Pa. June 11, 2007) (stating that the allocation of evidentiary burdens under PUFTA "is not clear," and finding it unnecessary to decide the question).

## 2.

The first step in the analysis is to determine whether DCI received any value – direct or indirect – from its payment to BOA. In this proceeding, the parties agree that BOA and DCI had no contractual relationship. BOA was not a creditor of DCI and DCI did not guarantee the Mortgage. Further, BOA concedes that it did not give value directly to DCI in exchange for the Mortgage payments.

BOA posits that DCI received reasonably equivalent value in the form of services from Darryl in exchange for the Mortgage payments that DCI paid to BOA. In other words, BOA contends that DCI realized a benefit "through the diminishment of what DCI might have otherwise have paid Darryl as direct compensation." (DCI's Post-Trial Memorandum 20).

The issue is whether the Mortgage payments were part of Darryl's compensation as DCI's President and therefore, made for or on account of an antecedent debt (thereby indirectly conferring value on DCI).

**3.**

The specific parameters of Darryl's compensation during his tenure at DCI, particularly during 2005 through 2009, were not well-documented and the testimonial evidence presented at trial did little to clarify matters.  Nonetheless, the record is sufficient to support the conclusion that the Transfers to BOA in payment of the Mortgage were not part of Darryl's compensation as DCI's President.

Darryl entered into the Employment Agreement with DCI in 1987, but the Agreement did not quantify a base salary amount.[21]

Notwithstanding the infirmities of the written Employment Agreement and amendment, Darryl's tax returns and corresponding W-2 Statements establish that he received a static salary. (Exs. D-12 - D-16).  DCI's expert, Feldman, confirmed that Darryl was receiving $125,000.00 per annum as salary.  The difficulty in determining the level of compensation to which Darryl was entitled arises from the fact that as DCI's President, Darryl, was wholly in control of determining his salary after 2004 and authorized many payments for his personal benefit from DCI's operating accounts.  The question is whether any of these payments comprised part of his salary.

Flitter testified that he periodically reviewed of DCI's monthly bank statements and identified payments that were made to or for Darryl's benefit.  Once these payments were identified, he determined how the payments were to be categorized on DCI's books.  The

---

[21]      The Employment Agreement may have been amended; however, there is only an unexecuted copy of the amendment and no corroborating testimony that the parties in fact entered into the amendment.  The amendment provided for modifications to Darryl's bonus and did not change his (unspecified) base salary.

payments were accounted for by including them in the L&E Account (representing non-interest

advances or loans from DCI to Darryl) or tracking them as commissions.

One factor that Flitter took into account when deciding where to record the payments was

the size of the payments.  Flitter explained that large advances were tracked in the L&E Account.

Although Daryl reported the advances as income on his federal income tax returns, DCI did not

provide Daryl with either a W-2 Statement or a Form 1099 on account of the L&E Account and

commissions, as would be customary for remuneration for services performed.  See In re

Innovative Communic'n Corp., 2011 WL 3439291, *19 (Bankr. D.VI. Aug. 5, 2011) (had the

company considered payments to third-parties as compensation finding that, company would

have issued a W-2 Statement or Form 1099 to its president and CEO).

I infer from the fact that Flitter, the corporate accountant, decided how to record the

outlays of cash, that no set agreement was in place providing for payments to third parties on

Daryl's behalf as part of his employment compensation.  Further, the Employment Agreement

itself does not contain a provision for DCI's payment of Daryl's Mortgage payments as part of

his compensation.  See In re Circuit Alliance, Inc., 228 B.R. 225, 231 (Bankr. D. Minn. 1998)

(holding that transfers were fraudulent where managing agent was using corporate checking

account as his own and was not authorized to draw upon corporate revenues for his personal

obligations).

The expert report also establishes that Darryl drew between $430,000.00 and $765,000.00

per year from DCI.  Flitter acknowledged at trial that the commissions were not tied to any

formula pursuant to a contract,[22] but rather they were outlays of cash to or for Darryl's benefit.

See Circuit Alliance, 228 B.R. at 231 (finding managing agent failed to sustain burden to show

value where payments from corporation were not authorized for his personal expenses); see also

In re Prime Mortg. Fin'l, Inc., 2011 WL 4572006, at *4-5 (B.A.P. 1st Cir. Feb. 14, 2011) (holding

bankruptcy court did not err in finding lack of reasonably equivalent value to debtor when

principal was not entitled to additional compensation for payment of lease);

In re Supplement Spot, LLC, 409 B.R. 187 (Bankr. S.D. Tex. 2009) (finding no value to debtor

where debtor made payments on properties not used to benefit debtor's business).

Based upon these facts, I find that the Transfers to BOA were not rooted in any legal

obligation DCI owed Darryl.  The payments for Darryl's benefit are more accurately

characterized as distributions to Darryl on account of his equity interest in DCI, rather than

officer compensation.  As such, the distributions were treated correctly by Flitter and Darryl as

income to Darryl.  However, the fact that the distributions are taxable income to Darryl does not

make them payments on account of a DCI liability.  Generally, payment of dividends are not the

payment of a corporate liability.  See In re Agricultural Research and Technology Group, Inc.,

916 F.2d 528, 540 (9th Cir. 1990) (in context of a partnership distribution).  In the absence of any

DCI obligation to Darryl and corresponding reduction in liability after making the payments,  the

distributions to Darryl in the form of third party payments to BOA do not represent a transfer for

any value given to DCI.  See In re Brentwood Lexford Partners, LLC, 292 B.R. 255, 267 (Bankr.

---

[22]     Corroborating testimony was presented by DCI in the form of Deborah Farina and
Howard Chinn, who both described Darryl's role at DCI as not involving any type of sales in the period
after 2004.  (1 N.T. 93, 2 N.T. 41).  In fact, both witnesses testified that Darryl's presence at DCI on a
daily basis was limited, with at times, week-long absences.

N.D. Tex. 2003) (LLC did not receive reasonably equivalent value where payments made to the

equity holders were dividends made on account of their equity interest, not on account of services

rendered and a contractual right to payment).  It follows that DCI did not receive reasonably

equivalent value in return for the Transfers.

### E.  Insolvency Under PUFTA §5105

### 1.

Insolvency is defined under PUFTA as follows:

> A debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater
> than all of the debtor's assets.

12 Pa. C.S. §5102(a).[23]  This definition is derived from the Bankruptcy Code 11 U.S.C. §101(32)

and is a "balance sheet test" in which the inquiry is whether, at fair valuations, "debts exceed

assets."  12 Pa. C.S. 5102, Committee Comment (1); In re Am. Rehab & Physical Therapy, Inc.,

2006 WL 199743, at *8 (Bankr. E.D. Pa. 2006).

Feldman, DCI's expert, opined that DCI was insolvent between 2005 through 2009, with

a negative equity in excess of $2 million for each of those years.  (See Ex. 301; 1 N.T. 24).  He

derived this information from the balance sheets that were remitted with the corporate tax

---

[23]     In addition, there is a presumption of insolvency under §5102(b):

> A debtor who is generally not paying the debtor's debts as they become due is
> presumed to be insolvent. This presumption shall impose on the party against
> whom the presumption is directed the burden of proving that the nonexistence of
> insolvency is more probable than its existence.

In its post-trial memorandum, BOA asserts that the presumption of insolvency under §5102(b)
was inapplicable.  Because I find that DCI proved insolvency under §5102(a), I do not reach this issue.

returns.  (1 N.T. 24).  There was no contrary evidence introduced.

BOA nevertheless requests that Feldman's opinion be disregarded.  BOA argues that the expert report is inaccurate because it is based on a faulty premise: that DCI's obligation to the David Estate attributable to the $3.7 million Note was a valid, enforceable obligation.  BOA contends that the Note DCI carried on its books was not legally unenforceable and should not be considered in a evaluating insolvency under PUFTA.  As a result, according to BOA, DCI did not prove that it was insolvent when the Transfers were made.

## 2.

BOA's attack on the expert's opinion is based on the proposition that the statute of limitations had expired, making the Note unenforceable.  BOA posits that the Note was subject to the four (4) year statute of limitations under Pennsylvania law.  See 42 Pa.C.S. §5525(a). BOA suggests that DCI defaulted when the Note matured in 1994 and that the limitations period had expired more than ten (10) years before the Transfers.

In response, DCI invokes the acknowledgment doctrine and argues that the statute of limitations had not expired prior to the Transfers.[24]

---

[24]    DCI also argues that the Note was under seal and the statute of limitations was twenty (20) years.  See 42 Pa.C.S. §5529(b)(1).  BOA disputes that the Note was under seal on the ground that the Note contains only a "corporate seal" not a separate "contractual seal."  BOA also counters that the Note modification "unsealed" the Note, so to speak, rendering the four (4) year limitations period applicable.

Because I conclude that the Note was enforceable under the four (4) year statute of limitations, I need not decide whether the original Note was under seal.  Compare In re Joshua Hill, Inc., 199 B.R. 298, 324-26 (Bankr. E.D. Pa. 1996) (distinguishing a corporate seal from a contract signed under seal); Coleman v. Pittsburgh Coal Co., 43 A.2d 540, 541 n.1 (Pa. Super. Ct. 1945) (same), with Beneficial Consumer Discount v. Dailey, 644 A.2d 789 (Pa. Super. Ct. 1994) (rebuttable presumption of
(continued...)

Under the acknowledgment doctrine, a statute of limitations may be tolled or its bar

removed by a promise to pay the debt. Makozy v. Makozy, 874 A.2d 1160, (Pa. Super. Ct.

2005). As the Pennsylvania Superior Court has explained:

> A clear, distinct and unequivocal acknowledgement of a debt as an existing
> obligation, such as is consistent with a promise to pay, is sufficient to toll the
> statute. There must, however, be no uncertainty either in the acknowledgment or
> in the identification of the debt; and the acknowledgment must be plainly
> referable to the very debt upon which the action is based; and also must be
> consistent with a promise to pay on demand and not accompanied by other
> expressions indicating a mere willingness to pay at a future time. A simple
> declaration of an intention to discharge an obligation is not the equivalent of a
> promise to pay, but is more in the nature of a desire to do so, from which there is
> no implication of a promise.

Huntingdon Fin. Corp. v. Newtown Artesian Water Co., 659 A.2d 1052, 1054 (Pa. Super. Ct.

1995) (quoting Maniatakis' Estate, 101 A. 920, 921 (Pa. 1917)).

In this proceeding, several factors lead me to conclude that the limitations period had not

expired and that the Note was enforceable at the time of the Transfers.

First, the evidence was undisputed that interest on the Note was paid until late 2004.

Payment on a debt obligation is an affirmative acknowledgment of the debt. United States v.

Hemmons, 774 F. Supp. 346, 351 (E.D. Pa. 1991) ("Under Pennsylvania law . . . a loan payment

serves as an acknowledgement of the total outstanding debt, the statute of limitations

---

[24](...continued)
a sealed contract arises when a party signs a contract which contains the pre-printed word "seal").

      Nor need I decide whether the extension of the statute resulting from the execution of a
contract under seal is vitiated by a subsequent modification of the contract, if the modification is in a
writing not executed under seal. See Novice v. Alter, 139 A. 590, 592 (Pa. 1927) (if modification did not
create new contract, a party may sue on the original agreement under seal); Wachovia Bank, N.A. v.
Rosen, 2004 WL 1593644, at *1 (C.P. Phila. June 17, 2004) (subsequent modifications to a Surety
Agreement which was signed under seal does not transform the twenty (20) year statute of limitations to
a four (4) year statute of limitations).

re-commences running with each payment."); <u>Newtown Artesian Water</u>, 659 A.2d at 1053

("There can be no more clear and unequivocal acknowledgement of debt than actual payment").

Second, DCI acknowledged the Note in writing in at least two (2) instances. The parties

entered into a subordination agreement with BMT that subordinated the payment of the Note in

favor of the BMT loans. DCI affirmed the subordination agreement, and the Note, in its second

loan modification with BMT in 2008.

Third, DCI acknowledged the continuing viability of the Note by carrying the

indebtedness on its corporate books each year through and including DCI's bankruptcy filing.

Based on this evidence, even if the Note was subject to a four (4) year statute of

limitations, I conclude that the debt was revived by the acknowledgment doctrine and remained

enforceable throughout the period, June 2007 to August 2009, during which the Debtor made

payments to BOA on account of Darryl's personal Mortgage. Therefore, it was proper for

Feldman to factor in the Note in his analysis of DCI's financial condition in this time period.


### F. Remaining Assets Being Unreasonably Small Under PUFTA §5104(a)(2)(i)

As an alternative ground, I find that DCI established that, at the time of the Transfers, its

assets were "unreasonably small" within the meaning of PUFTA §5104(a)(2)(i).

In addition to determining that DCI's negative equity ranged from $2.1 million to $8.7

million from 2005 to 2009, Feldman also examined DCI's "financial ratios" and compared them

to industry data derived from RMA. (1 N.T. 28). Feldman concluded that DCI did not have any

return on equity and the debt to assets ratio was over 100%. (1 N.T. 28). Feldman concluded

that DCI's current and quick ratios were substantially low (1 N.T. 28), indicating that DCI had a

liquidity problem and was thinly capitalized because

> it was heavily ladened with debt and no equity to support the asset composition.
> And . . . from a receivable standpoint, the accounts receivable turnover was well
> below industry standards, probably because a lot of the receivables that were
> being carried on the books of the company were significantly old and would not
> be collectable.

(1 N.T. 29). Feldman's written report elaborated:

> Due to the balances of the receivables, payables and cash, any price decrease
> would have a significant negative consequence to the company due to its lack of
> cash. Given the high receivable and inventory turnovers, the company's typical
> cash balances, which were only a fraction of one month's overhead made it
> extremely vulnerable in the event of an economic turndown.

(Ex. 301, at 4).

I credit Feldman's opinion and find that, at the time of the Transfers, DCI's "remaining

assets . . . were unreasonably small in relation to the business . . . ." 12 Pa. C.S. §5104(a)(2)(i).


### G.  Avoidance of the Transfers

Having found that the Transfers was not made for reasonably equivalent value at a time

that DCI was insolvent, I conclude that the Transfers are avoidable under 11 U.S.C. §544(b) and

PUFTA §5105.  In the alternative, having found that the Transfers was not made for reasonably

equivalent value at a time that DCI was engaged in a business for which the remaining assets

were unreasonably small, I conclude that the Transfers are avoidable under 11 U.S.C. §544(b)

and PUFTA §5104(a)(2).

### H.  11 U.S.C. §550

Section 550(a) of the Bankruptcy Code provides, in pertinent part, that if a transfer is avoided pursuant to 11 U.S.C. §544(b), "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property from . . .  the initial transferee."  11 U.S.C. §550(a).  Section 550(a) is a "recovery provision" that gives rise to a "secondary cause of action" after the trustee has established an entitlement to avoid a transfer under one of the other Code avoidance provisions.  In re Resource, Recycling & Remediation, Inc., 314 B.R. 62, 69 (Bankr. W.D. Pa. 2004).

In this proceeding, it is indisputable that BOA was the initial transferee of the Transfers that I have determined are avoidable under §544(b).  The record establishes that the total value of the Transfers was $155,313.84.

Section 550(a) provides two (2) alternative remedies.  The bankruptcy court can either award the trustee (1) the actual property, or (2) the value of the property.  E.g., In re Taylor, 599 F.3d 880, 890 (9th Cir. 2010).  The bankruptcy court has discretion in fashioning the remedy. See, e.g., In re Berley Associates, Ltd., 492 B.R. 433, 443 (Bankr. D.N.J. 2013).  In exercising that discretion, it should consider that §550(a) is "intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred."  In re Fine Diamonds, LLC, 2013 WL 5614231, at *16 (Bankr. S.D.N.Y. Oct. 11, 2013).

Here, DCI seeks to recover that value in the form of a money judgment.  Because the property transfer that has been avoided was the payment of money, I find that the entry of a money judgment in favor of DCI to be an appropriate means of restoring the estate to the position it was in prior to the Transfers.  See In re Oberdick, 490 B.R. 687, 710 (Bankr. W.D. Pa. 2013);

In re Rhodes, Inc., 2008 WL 7880903, at *2 (Bankr. N.D. Ga. Oct. 28, 2008); In re Rae, 2008

WL 190377, at *8 (Bankr. D. Minn. Jan. 18, 2008); see also Hagan v. Freedom Fid. Mgt., Inc.,

2011 WL 8491076, at *1 (W.D. Mich. Sept. 20, 2011); Fine Diamonds, 2013 WL 5614231, at

*16.


### G.  Prejudgment Interest

DCI requests that the court award prejudgment interest.

In In re Hechinger Inv. Co. of Delaware, Inc., 489 F.3d 568, 579 (3d Cir. 2007), the Court

of Appeals observed that, although there is no reference to prejudgment interest in the

Bankruptcy Code, the concept is inherent in the §550(a) remedy of awarding the trustee the

"value" of the property transferred.  The court held that the award of prejudgment interest is

"within the discretion of the bankruptcy court," but that "prejudgment interest should be awarded

unless there is a sound reason not to do so."  Id. at 579-80 (internal quotations and citations

omitted).[25]

---

[25]     One court has identified the following factors to be considered in evaluating the
propriety of awarding prejudgment interest:

> (1)  whether there is a statutory provision to the contrary;
>
> (2)  whether the award of prejudgment interest would serve to compensate the
> injured party;
>
> (3)  whether the award is otherwise equitable; and
>
> (4)  whether the amount of the contested payment was determined prior to the
> court's judgment.

In re Jackson, 249 B.R. 373, 378 (Bankr. D.N.J. 2000).

Although <u>Hechinger</u> was a preference case under 11 U.S.C. §547, its holding equally

applies to transfers avoided as fraudulent under §544 or §548.  This is because the presumption

in favor of prejudgment interest is rooted in 11 U.S.C. §550(a), a provision that is equally

applicable to transfers avoided under §548 and §544(b).  <u>See, e.g.</u>, <u>Donell v. Kowell</u>, 533 F.3d

762, 772 (9th Cir. 2008); <u>Matter of Tex. Gen. Petroleum Corp.</u>, 52 F.3d 1330, 1339-40 (5th Cir.

1995); <u>In re Inv. Bankers, Inc.</u>, 4 F.3d 1556, 1566 (10th Cir. 1993).[26]

In this proceeding, BOA has not articulated any grounds for the denial of prejudgment

interest as inequitable or as otherwise inappropriate.  I perceive no reason to depart from the

presumption in favor of awarding prejudgment interest.  <u>See</u> <u>In re Philadelphia Newspapers,</u>

<u>LLC</u>, 2012 WL 712, 727 (Bankr. E.D. Pa. Mar. 22, 2012); <u>cf.</u> <u>In re Bellanca Aircraft Corp.</u> 850

F.2d 1275, 1281 (8th Cir. 1988) (affirming bankruptcy court's discretionary denial of request for

prejudgment interest where the preference payment was not ascertainable without a judicial

determination); <u>In re Interstate Bakeries Corp.</u>, 2013 WL 301820 (Bankr. W.D. Mo. June 17

2013) (denying prejudgment interest as inequitable because value of avoidable transfer was not

clear prior to trial, making it impossible for the defendant to determine how much it might owe

_____

[26]     In proceedings under §544(b), some courts have looked to state law in evaluating
whether to award prejudgment interest.  <u>See, e.g.</u>, <u>In re Agricultural Research and Technology Group,</u>
<u>Inc.</u>, 916 F.2d at 540; <u>In re Keefe</u>, 401 B.R. 520, 526-27 (B.A.P. 1st Cir. 2009); <u>cf.</u> <u>Supplement Spot</u>, 409
B.R. at 208 (the right to prejudgment interest arises under federal law, but the interest rate is determined
under state law).  Respectfully, I disagree with these decisions.

        The request for prejudgment interest arises in a federal bankruptcy cause of action, <u>i.e.</u>,
11 U.S.C. §550(a), that provides the remedy for the transfer avoided under §544(b).  That the preliminary
claim under §544(b) happens to incorporate by reference the elements of state law in determining
whether the transfer may be avoided is distinct from the express federal remedy provided once the
transfer is avoided.  Accordingly, I see the issue whether prejudgment interest should be awarded as a
question of federal law arising under 11 U.S.C. §550(a), not state law.  <u>Accord</u> <u>In re Harlin</u>, 325 B.R.
184, 192 (Bankr. E.D. Mich. 2005).

and because trustee's tactical decisions delayed the adjudication).[27]

> This leaves two (2) final questions.

>> (1) When does interest start to run: date of transfer, date of demand for repayment, date of filing of transfer avoidance complaint?

>> (2) What interest rate should be applied?

These questions are left to the court's discretion.

> In this proceeding, I need not choose between the date of demand and the date of the filing of the complaint. DCI has limited its request to prejudgment interest from the date of the filing of the original complaint. (See DCI Post-Trial Mem. at 26).[28]

---

[27]    In Interstate Bakeries, the court also stated broadly that "[a] trustee is not generally entitled to prepetition interest if there existed a good faith dispute as the creditor's liability." 2103 WL at *11. Although there are reported cases in which bankruptcy courts have denied prejudgment interest where defendants raised "credible or respectable defenses," In re Felt Mfg.Co., Inc., 2009 WL 3348300, at *13 (Bankr. D.N.H. Oct. 16, 2009) (citing cases), it may be an overstatement to state the existence of such a defense generally precludes an award of prejudgment interest. In this proceeding, although I certainly would characterize BOA's defense as "respectable," in the particular circumstances presented, I am not convinced that the equities are sufficient to overcome DCI's presumptive right to prejudgment interest.

[28]    In In re Great-Point Intermodal, LLC, 334 B.R. 359, 363-64 (Bankr. E.D. Pa. 2005), the court suggested that, as a general rule, prejudgment interest accrues from the date of the pre-complaint demand for payment of the value of an avoidable transfer. Many courts follow this approach, further holding that in the absence of evidence of the date of the trustee's pre-complaint demand for recovery of unauthorized transfers, the court will treat the date of the filing the complaint as the date of demand. In fact, this is what occurred in Great Point Intermodal. Id.; accord In re Living Hope Southwest Med. SVCS, LLC, 450 B.R. 139, 158 (Bankr. W.D. Ark. 2011); In re Global Technovations, Inc., 431 B.R. 739, 776 (Bankr. E.D. Mich. 2010). But cf. In re Sophisticated Communic'ns, Inc., 2007 WL 3216613, at *4 (Bankr. S.D. Fla. Oct. 24, 2007) (date of complaint used as starting point because preferential transfers were not identified sufficiently in demand letter to put defendant on notice of avoidability of the transfers).

Other courts have awarded prejudgment interest back to the date of the transfers. See, e.g., In re Quebecor World (USA), Inc., 2013 WL 5365404, at *4 (Bankr. S.D.N.Y. Sept. 25, 2013); In re Vaso Active Pharmaceuticals, Inc., 2012 WL 4793241, at *23-24 (Bankr. D. Del. 2012) (same). But cf. In re Affinity Health Care, Mgt., Inc., 2013 WL 4525582, at *14 n.20 (Bankr. D. Conn. Aug. 27, 2013)

(continued...)

The last task is to set the appropriate interest rate.

On this question, courts take various approaches.  The initial divide is between those courts that apply state law and those courts that apply federal law.  Compare In re Maui Indu. Loan & Fin. Co., Inc., 2013 WL 2897792, at *10 (D. Haw. June 13, 2013) (state law); In re Advanced Modular Power Sys., Inc., 413 B.R. 643, 684 (Bankr. S.D. Tex. 2009) (same), with In re Rivas, 2012 WL 1156406, at *6 (Bankr. E.D. Tenn. Apr. 6, 2012) (federal law); Living Hope, 450 B.R. at 158 (same).  Consistent with my conclusion that the award of prejudgment interest is a remedy provided by a federal bankruptcy cause of action, i.e., 11 U.S.C. §550(a), I hold that the appropriate interest rate is determined by federal law.  See n.25, supra.

In one case in this bankruptcy district, the court applied the federal statutory post-judgment interest rate, see 28 U.S.C. §1961,[29] to calculate the pre-judgment interest.  Great-Point Intermodal, 334 B.R. at 364; accord In re Int'l Mgt. Associates, LLC, 495 B.R. 96, 106 n.8 (Bankr. N.D. Ga. 2013); In re Rivas, 2012 WL 1156406, at *6 (Bankr. E.D. Tenn. Apr. 6, 2012).

---

[28](...continued)
(running interest from date of demand rather than the date of transfer after avoidance of a preference is appropriate because "the transfer is not improper in any respect at the time it occurs").

[29]    Section 1961 provides:

> (a)  Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . .  Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. . . .

> (b)  Interest shall be computed daily to the date of payment except as provided in section 2516(b) of this title and section 1304(b) of title 31, and shall be compounded annually.

In <u>In re 1031 Tax Group, LLC</u>, 439 B.R. 84, 87-89 (Bankr. S.D.N.Y. 2010), however, the court pointed out that courts have exercised their discretion on this issue and employed various other interest rates, including: (a) statutory rates under state law; (b) IRS underpayment rates; and (c) the bank "prime" loan rate.  In <u>1031 Tax Group</u>, based on "the facts and circumstances in this case," the court employed the prime rate.  <u>Id.</u> at 89.

In the circumstances presented here, involving transfers that I have found to be constructively fraudulent, and DCI's consent to limit the time frame to the filing of the complaint, I find it appropriate to follow <u>Great-Point Intermodal</u> and apply the interest rate set by 11 U.S.C. §1961.

Consequently, DCI is entitled to prejudgment interest under 28 U.S.C. §1961 commencing on October 11, 2011.

## VI.  CONCLUSION

For the reasons stated above, I have found that: (1) the Transfers totaling $155,313.84 are avoidable as constructive fraudulent transfers pursuant to 11 U.S.C. §544(b) and 12 Pa.C.S. §§5104(b)(2)(i) and 5105; and (2) DCI is entitled to the entry of a money judgment in its favor in the amount of $155,313.84, plus prejudgment interest from October 11, 2011.   An appropriate order follows.

**Date:  November 19, 2013**

**ERIC L. FRANK**
**CHIEF U.S. BANKRUPTCY JUDGE**